IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


VOICENET COMMUNICATIONS,          :      CIVIL ACTION
INC., et al.                      :
                                  :
            v.                    :
                                  :
THOMAS W. CORBETT, JR.,           :
et al.                            :      NO. 04-1318


MEMORANDUM AND ORDER

McLaughlin, J.                              September 13, 2010


        This case concerns a search and seizure conducted on

the plaintiffs' premises on January 21, 2004.  The plaintiffs,

providers of various computer and Internet services, claim that

the defendant law enforcement officials[1] violated various

constitutional and statutory rights in connection with the

seizure, pursuant to a search warrant, of their computer

equipment.

        The search arose out of an investigation into whether

evidence of child pornography could be found on the plaintiffs'

Quikvue internet service.  Based upon a tip that child

_____

        [1]    The defendants are Attorney General Thomas W. Corbett,
Jr.; Special Agent Michele L. Deery; Bucks County Detectives
Martin McDonough and Thomas Thiel; Delaware County District
Attorney G. Michael Greene; and Bucks County District Attorney
Diane E. Gibbons.  Detectives McDonough and Thiel, and District
Attorneys Green and Gibbons are named in their official and
individual capacities.  Agent Deery is named in her individual
capacity only, and Attorney General Corbett is named in his
official capacity only.

pornography was available through Quikvue, the defendants conducted an investigation that resulted in the search of the plaintiffs' property and the seizure of the plaintiffs' Quikvue-related computer equipment and documents. The plaintiffs allege that the seizure of their materials violated the First, Fourth and Fourteenth Amendments; the Communications Decency Act (the "CDA"), 47 U.S.C. § 230; and the Commerce Clause of the United States Constitution.

The Court considers the parties' four cross-motions for summary judgment.[2]  Four issues arise out of those motions: (1) whether the search and seizure of the plaintiffs' property violated their constitutional rights under the First, Fourth or Fourteenth Amendments; (2) whether the defendant governmental entities had a policy, practice or custom that resulted in a violation of the plaintiffs' First Amendment rights; (3) whether the defendants' actions were in violation of the commerce clause of the United States Constitution; and (4) whether the plaintiffs are entitled to injunctive or declaratory relief under the CDA.

The Court grants summary judgment for the defendants on all of the plaintiffs' claims.  The Court finds that the

---

[2]     Those motions are (1) District Attorney Gibbons and Detectives McDonough and Thiel's motion for summary judgment (the "Bucks County Defendants' motion"); (2) Attorney General Corbett and Agent Deery's motion for summary judgment (the "OAG motion"); (3) District Attorney Greene's motion for summary judgment (the "Greene motion"), and (4) the plaintiffs' motion for summary judgment (the "plaintiffs' motion").

defendants' search and seizure violated neither the First nor the Fourth Amendment. Because the Court finds no constitutional violations, the Court also finds for the defendants on the plaintiffs' Monell and commerce clause claims, both of which depend upon the existence of a constitutional violation. Finally, the Court grants summary judgment for the defendants on the plaintiffs' claims for injunctive and declaratory relief under the CDA, finding that such claims are either moot or would require the Court to impermissibly enjoin a future criminal proceeding.[3]

I.   The Summary Judgment Record

        In setting forth the summary judgment record, the Court (1) describes the plaintiffs' Quikvue service, and (2) discusses the facts surrounding the defendants' investigation, the issuance and execution of the search warrant, and the seizure of the plaintiffs' materials.

---

        [3]   The defendants also assert various immunity defenses, including qualified and prosecutorial immunity. The Court does not reach these arguments because it finds that no substantive violations occurred. The Court also does not reach the defendants' argument that Voicenet lacks standing to bring this suit.

A.  Quikvue

        Voicenet Communictions, Inc. ("Voicenet") is a
technology company that provides, among other services, Internet
access.  Omni Telecom, Inc. ("OTI") also provides Internet access
and is a Voicenet customer.  Voicenet and OTI combined their
services to create Quikvue, a subscriber-based service that
provides its customers with web access to the Usenet, an area of
the Internet that exists independently of the World-Wide-Web.

        The Usenet is comprised of text, video, images,
software, or other files, all referred to as "articles."  Each
day, a large amount of Usenet articles are posted and dispersed
among separate Usenet newsgroups.  The articles are disseminated
over the Usenet peer network, a network connecting computers
worldwide.  A Usenet peer can automatically copy and store Usenet
content and make such content available both to other peers and
to its individual users or customers.

        Individual users access the Usenet by using a
"newsreader."  Newsreaders typically work by communicating with a
Usenet peer or peers to index selected articles or newsgroups.
Newsreaders can function as standalone pieces of software or they
can be web-based.

        Quikvue is a web-based Usenet newsreader.  Quikvue
automatically compiled and stored Usenet articles on the
plaintiffs' servers.  For a fee, Quikvue subscribers could access

those articles through an interface provided on the World-Wide-Web.  As new articles were collected and stored, older articles were automatically deleted from the plaintiffs' servers.

On its website, Quikvue advertised itself as a place for uncensored and unmonitored access to Usenet content. Quikvue's homepage declared that it contained "millions of uncensored[] pictures, movies, discussions and more."  It stated that anyone "looking for uncensored photo[]s[,] movies[,] and more" had "just hit the motherload," promising "unlimited, full access" to "an all-can-eat taste of 'the Internet gone wild.'" It also emphasized user-privacy, stating that "[w]e respect your privacy" and that "[w]e don't track the types of files you view or download or the categories you visit."  See Affidavit of Probable Cause for Search Warrant ("Aff. of P.C.") at 2-3, attached as Ex. E to the Bucks County Defendants' motion.

The website also contained a disclaimer explaining that Quikvue is "an extremely fast newsreader and compiler of pictures and other multimedia internet content."  It warned that, because of its speed and the fact that OTI and Quikvue did not control the content accessed through Quikvue, "erotic or otherwise offensive material and material not suitable for children and teens under the 18 years of age may be presented . . . even if not requested by the user."  It stated that the user "must decide what is appropriate or legal to download."  Id.

B.    <u>The Investigation and Execution of the Search Warrant</u>

In late 2003, defendant Agent Deery, an employee of the Pennsylvania Office of the Attorney General (the "OAG") assigned to the Internet Crimes Against Children Task Force (the "ICAC"),[4] received an anonymous tip that Quikvue was selling child pornography.[5]  Based on this tip, Agent Deery began an investigation into Quikvue.

During the investigation, Agent Deery understood Quikvue to be a service that provided its subscribers with an easy way to access the Usenet.  She also believed that Quikvue "was pooling all of [the Usenet] information onto their servers and categorizing it and making it easier for people to get to."  Deposition Testimony of Detective Michele Deery ("Deery Dep.") at 40, attached as Ex. H to the plaintiffs' motion.

Using search terms that she knew to be regularly associated with sexually explicit depictions of children, Agent Deery confirmed that Quikvue users were able to use the service to search for, find and download child pornography.  Agent Deery describes her investigation in the affidavit of probable cause.

---

[4]    The Bucks County District Attorney's Office, the Delaware County District Attorney's Office, and the OAG are all part of the ICAC.

[5]    The individual behind the tip was later revealed to be from WPVI Action News employee Mike Neilon.  Agent Deery was never informed as to the identity of Mr. Neilon's source.

Using an undercover credit card and email address,
Agent Deery signed up for a 3-day trial subscription to Quikvue.
She then entered the search term "preteen." Approximately 50
images were displayed. The images depicted preteen girls in the
nude, some of them in sexual poses. One of the images depicted a
young girl performing oral sex on what appeared to be an adult
male. Another depicted a preteen boy also performing oral sex on
what appeared to be an adult male. Aff. of P.C. at 3-4.

After the 3-day trial subscription expired, Agent Deery
used the same undercover credit card and email to purchase a
monthly subscription to Quikvue. With this subscription, Agent
Deery entered the search term "underage." The search yielded
approximately 700 images. She described six of the images in
detail in the affidavit and also stated that "[a] significant
number of images located" depicted children under the age of 18,
mainly females, in various states of undress and engaged in
sexual acts with other children or adults. Id. at 4. Another
search, using the term "firsthair," yielded approximately 1500
images. Agent Deery stated in the affidavit that "[a]gain a
significant amount of these pictures" depicted both boys and
girls under the age of 18 in various states of undress and/or
engaging in sexual acts with other children or adults. Id. at 4.

On December 2, 2003, Agent Deery downloaded 10-15
images from Quikvue's website and simultaneously captured the IP

address of the location from which the images had been sent.
Working with Detective McDonough, Agent Deery confirmed that the
computers hosting the images were on plaintiffs' premises in
Ivyland, Pennsylvania.  Agent Deery noted that, unlike other
peer-to-peer services that she had encountered in her previous
child pornography investigations, Quikvue appeared to store the
images on their servers, rather than merely facilitating a
transmission between two parties.

Agent Deery sent some of the images that she discovered
to the National Center for Missing and Exploited Children (the
"NCMEC").[6]  The center compared Agent Deery's images to images in
their system and verified that 8 of the images were in their
database of known child pornography depicting abuse of real
children.[7]

Agent Deery accessed the Quikvue website again on
January 20, 2004.  She conducted another search using the term

_____

[6]     The NCMEC is a private, non-profit organization that
provides services for families and professionals in the
prevention of abducted, endangered and sexually exploited
children.

[7]     In an e-mail dated November 25, 2003, Keith Daniels, an
NCMEC employee, gave Agent Deery advice about conducting the
investigation.  That email states, among other pieces of specific
advice, that "[o]ne concern I am having is with mens rea
(criminal intent)."  He also states that he did not "really know
all of the ins and outs in this case" and was "fishing quite a
bit here."  Email from Keith Daniels dated November 25, 2003,
attached as Ex. C. to Plaintiffs' Reply in Further Support of
Their Motion for Summary Judgment on Liability ("Pl.'s Reply
Br.").

"underage." That search yielded 2803 images. Various images
from this search depicted females under the age of 18 exposing
their genitals and/or engaging in sexual acts with other children
or adults.

After completing the investigation, Agent Deery and
Detective McDonough drafted the affidavit of probable cause.
After briefly describing the relevant experience and expertise of
Agent Deery and Detective McDonough, the affidavit avers that

> we believe that the crime of Sexual Abuse of Children,
> Possession/Distribution of Child Pornography, a
> violation of Pennsylvania Crime Code 18 PA CS Sexual
> Abuse of Children 6312 C and D, and 18 PA CS A 7512
> Criminal Use of a Communicaion Facility was/is being
> committed by, Voicenet, OTI Productions, and Quikvue,
> located at 17/and 21 and 23 Richard Rd, Ivyland
> Pennslyvania. Furthermore, we believe that evidence of
> the crimes relating Sexual Abuse of Children,
> Possession/Distribution of Child Pornography, . . . and
> . . . Criminal Use of a Communication Facility will be
> located at the premises at 17 (Voicenet) and 21 (OTI
> Productions) and 23 Richard Road.

Aff. of P.C. at 1.

Along with the detailed description of the
investigation, the affidavit provides a description of how
computer systems operate and highlights the difficulties
attendant in locating and segregating evidence of a crime on a
computer system. The affidavit explained that, in order to
accurately retrieve and preserve any evidence of contraband
contained in the system, it is best to seize an entire computer
system and search it offsite. The affidavit also provided that,

according to the affiants' experience, computers are utilized by individuals who exploit children, including those who collect and distribute child pornography.

The affidavit requested permission to search plaintiffs' premises and to seize and transport the Quikvue computer system back to a secure location for an offsite search. Attached to the affidavit was a list of items the defendants sought permission to seize. In addition to computer hardware, images of child pornography and anything relating to the distribution, possession, receipt, purchase, sale, trade or transmission of child pornography, the attachment also listed records related to the plaintiffs' business transactions and subscriber information. Aff. of P.C., Attachment A.

Non-defendant and Bucks County Assistant District Attorney Robert Mancini, approved the search warrant. District Justice H. Warren Hogeland signed the warrant on January 20, 2004.

Defendants Agent Deery and Detectives McDonough and Thiel, accompanied by uniformed officers and non-defendant Special Agent Steven Arter, executed the warrant on the morning of January 21, 2004. Brian Adelson, then Voicenet's Vice-President of Operations, and Rudy Kappra, Voicenet's Vice President of Development, assisted Agent Arter in finding the Quikvue equipment. The Quikvue equipment was stored in a "server

room," which contained approximately 150-200 pieces of equipment. Mr. Adelson identified a rack containing all of the Quikvue equipment, which included a web server and two JET-STOR IDE RAID arrays (the "RAID arrays"), which are large data storage devices that contained the Quikvue content.

The defendants seized the web server, the two RAID arrays, and two additional servers, the Newsbin01 server, which was necessary to read the content on the RAID arrays, and the APPDB server, which contained the customer records.[8] The defendants also seized four "barrel keys" used to operate some of the computers and a green folder labeled "Quikvue."

At some point during the search, defendant Delaware County District Attorney Greene and defendant Bucks County District Attorney Gibbons arrived on the premises. District Attorneys Greene and Gibbons each made statements to a WPVI news team, who had also arrived at some point during the search.[9]

_____

[8]     Although it was the defendants' intent to seize only the two RAID arrays and the web server and to make copies of the Newsbin01 server and the APPDB server, Mr. Adelson and Mr. Kapra told Agent Arter to take the Newsbin01 server and the APPDB server because they would not be needed without the other equipment.

[9]     On February 5, 2004, WPVI ran two stories featuring the footage from the seizure that included the district attorneys' statements. The broadcasts featured District Attorney Gibbons saying that "[t]his is the most horrendous form of child abuse as far as I'm concerned," and District Attorney Green stating that the seizure included "[k]nown images of children . . . known to be child pornography." WPVI News Broadcast of February 5, 2004, attached as Ex. N. to the Plaintiffs' Opposition to the Motion for Summary Judgment of Defendants Diane E. Gibbons, Martin

II.  Procedural History

          The plaintiffs filed their complaint and a motion for a
temporary restraining order and a preliminary injunction on March
26, 2007.  The motion sought, among other relief, the return of
the seized computer equipment.

          The Court held a conference with counsel on March 29,
2004, in which the plaintiffs agreed to withdraw their request
for a temporary restraining order.  Upon the consent of the
parties, the Court held a hearing on the plaintiffs' request for
a preliminary injunction on April 12, 2004.  The argument focused
on issues of abstention and First Amendment issues.

          The Court held further conferences with counsel on
April 20 and 23, 2004.  At those conferences, the Court expressed
its concern about possible First Amendment violations relating to
the defendants' continued possession of the plaintiffs' computer
equipment and urged the defendants to return the equipment.  The
defendants' agreed to the return.  The defendants further agreed
that they would not access the plaintiffs' subscriber information
without first notifying the plaintiffs.[10]  The Court also informed

_____

McDonough and Thomas Thiel and to the Motion for Summary Judgment
of Defendants Thomas W. Corbett and Michelle Deery ("Pls.
Opp'n").  The following day, Agent Deery appeared on a different
WPVI broadcast.

          [10]    The defendants seized subscriber information in both
paper and digital formats.

counsel that it believed that abstention was not appropriate because there was no ongoing state proceeding at that time.

The defendants returned either originals or duplicates of the web server, the Newsbin01 server, and the APPDB server. The defendants did not, however, return the RAID arrays. The plaintiffs argued that this partial return of their equipment was insufficient and revised their request for preliminary relief on April 27, 2004. The revised request asked the Court to determine, among other things, whether the defendants must immediately return or replace the RAID arrays.

On June 18, 2004, the plaintiffs moved for an immediate entry of judgment on their motion for a preliminary injunction. In a letter dated June 21, 2004, the Court stated that it planned to issue a ruling on the plaintiffs' motion by July 2, 2004. On July 2, 2004, however, the defendants submitted a letter to the Court explaining that an investigating grand jury had been convened in Bucks County and requested that the Court abstain under the Younger abstention doctrine. The Court scheduled a telephone conference to discuss the defendants' motion to abstain and its impact on the plaintiffs' preliminary injunction request. On July 6, 2004, before such a conference was held, the plaintiffs filed a Notice of Appeal with the United States Court of Appeals for the Third Circuit, arguing that the delay in

ruling on their motion for a preliminary injunction constituted an effective denial of that motion.

The Court held a hearing to discuss abstention on July 13, 2004. At the hearing, the parties agreed that the Court could not dismiss the entire case even if <u>Younger</u> applied, because the plaintiffs sought money damages in addition to injunctive and declaratory relief. The Court stated that it would rule on the plaintiffs' motion for a preliminary injunction and the defendants' motion to abstain.

In a memorandum and order dated July 15, 2004, the Court denied the plaintiffs' request for a preliminary injunction. <u>See</u> <u>Voicenet Commc'ns, Inc. v. Pappert</u>, No. 04-1318, 2004 WL 1732187 (E.D. Pa. July 15, 2004).[11] The Court found that any harm from the defendants' continuing possession of the RAID arrays was not irreparable. Because the plaintiffs had represented that they could replace the RAID arrays for approximately $20,000, the Court stated that they could be compensated for such an expense if they succeeded on the merits. <u>Id.</u> at *4. The Court also denied the plaintiffs' request that the defendants be enjoined from accessing their subscriber information. The defendants had previously agreed to notify the plaintiffs before they accessed this information, which would

---

[11]     The plaintiffs originally named the acting state attorney general at the time, Gerald J. Pappert, as a defendant. Attorney General Corbett replaced former Attorney General Pappert as a defendant on January 27, 2006.

give the plaintiffs an opportunity to seek an injunction if such a situation arose.  Id.  Finally, after concluding that the plaintiffs had not shown irreparable injury involving a chill on their First Amendment rights, the Court denied the plaintiffs' request for a declaration that they were entitled to notice and an opportunity to be heard before any future seizures of their servers.  Id. at *4-*5.

In a memorandum and order dated August 5, 2004, the Court denied the defendants' motion for abstention under Younger. After considering the language of the Pennsylvania Investigatory Grand Jury Act, 42 Pa. Cons.Stat. § 4541, et seq., and the actions of the grand jury itself, the Court found that, because the supervising judge of the grand jury could not, and did not, adjudicate the merits of the plaintiffs' federal claims, the investigating grand jury did not satisfy the requirements of Younger.  See Voicenet Commc'ns, Inc. v. Pappert, 2004 WL 1770388 at *6 (E.D. Pa. Aug. 5, 2004).  The Court noted that no criminal charges had been filed, and there was no indication whether criminal charges would ever be filed against Voicenet or OTI.

The plaintiffs appealed the denial of their preliminary injunction on August 12, 2004, and the United States Court of Appeals for the Third Circuit consolidated that appeal with their previous appeal.  The Court of Appeals affirmed this Court's

rulings on March 9, 2005.  See <u>Voicenet Commc'ns, Inc. v.</u>
<u>Pappert</u>, 126 F. App'x. 55 (3d Cir. 2005).

        The defendants jointly moved to dismiss counts II-VI of
the plaintiffs' complaint on July 29, 2004.[12]  The Court granted
the defendants' motion in part and denied it in part in a
memorandum and order dated August 30, 2006.  See <u>Voicenet</u>
<u>Commc'ns, Inc. v. Corbett</u>, No. 04-1318, 2006 WL 2506318 (E.D. Pa.
Aug. 30, 2006).  The Court granted the defendants' motion to
dismiss the plaintiffs' claims for violations of the Electronic
Communications Privacy Act[13] and the plaintiffs' due process
claims.[14]  The Court also granted the defendants' motion to
dismiss the plaintiffs' request for monetary damages under the
CDA.  The Court found that the defendants were entitled to
qualified immunity on these damages claims because the
plaintiffs' rights under the CDA were not clearly established at
the time of the events in question.  The Court, however, denied
the defendants' motion to dismiss the plaintiffs' requests for

_____

        [12]    The plaintiffs voluntarily dismissed their claim of
civil rights conspiracy under 42 U.S.C. § 1985 (count VII).  The
defendants did not move for dismissal of the plaintiffs' First
Amendment claim or the plaintiffs' Commerce Clause claim.

        [13]    Pub. L. No. 99-508, 100 Stat. 1848 (1986) (codified as
amended in scattered sections of 18 U.S.C.).

        [14]    The due process claims were based on alleged violations
of Pennsylvania's Internet Child Pornography Law, 18 Pa. C.S.
§ 7621, <u>et seq.</u>, and the Commonwealth Attorney's Act, 71 Pa. C.S.
§ 732-101, <u>et seq.</u>

injunctive and declaratory relief under the CDA and their Fourth
Amendment claims.

The parties then engaged in discovery.  They filed the
four instant motions for summary judgment in October of 2008.
The Court held oral argument on the parties' motions on July 9,
2009.  At oral argument, counsel for the Bucks County defendants
reported that there was no plan for any future investigation of
Voicenet or OTI, unless new information was presented.  See
Transcript of July 9, 2009, Hearing at 7:20-9:21.

The Court asked the defendants' counsel about the
possible return of the plaintiffs' RAID arrays.  The defendants'
counsel stated that they would attempt to coordinate their
efforts to return the RAID arrays to the plaintiffs, "scrubbed"
of all data to ensure that they were free of contraband.  Id. at
33:4-15; 42:19-44:24.  The plaintiffs would then be able to use
the arrays for their original purpose of storing the constant
flow of Usenet articles.  The scrubbed RAID arrays were returned
to the plaintiffs in September of 2009.[15]

On July 27, 2009, the Court placed the case in civil
suspense while the parties pursued settlement negotiations.  The
parties were not able to settle their dispute, so the Court
herein decides the parties' cross-motions for summary judgment.

---

[15]     Agent Arter returned the RAID storage arrays to the
custody of Bucks County on September 1, 2009.  Detective Thiel
then returned the RAID arrays to Voicenet on September 28, 2009.

III. <u>Analysis</u>

          In deciding the summary judgment motions,[16] the Court
will first analyze the plaintiffs' claims that the defendants
violated their rights under the Fourth and First Amendment.
Finding that no constitutional violation occurred, the Court
grants summary judgment for the defendants on the plaintiffs'
constitutional claims and on the plaintiffs' <u>Monell</u> and commerce
clause claims, because both of those claims are dependant upon
the plaintiffs' allegations of constitutional violations.
Finally, the Court analyzes the plaintiffs' claims for injunctive
and declaratory relief under the CDA and grants summary judgment
for the defendants on those claims as well.


     A.     <u>Constitutional Claims</u>

          The plaintiffs allege that the defendants violated the
Fourth Amendment by conducting an unreasonable search and seizure
of their property.  The plaintiffs also allege that the
defendants violated their rights under the First Amendment by

_____

          [16]     Under Rule 56 of the Federal Rules of Civil Procedure,
a party moving for summary judgment must show that there is no
genuine issue as to any material fact and that judgment is
appropriate as a matter of law.  Fed. R. Civ. P. 56(c).  The
burdens of proof do not change in cases where a court is
considering cross-motions for summary judgment.  <u>Peters Twp. Sch.</u>
<u>Dist. v. Hartford Accident and Indem. Co.</u>, 833 F.2d 32, 34 (3d
Cir. 1987).

failing to hold a prior adversary hearing to determine whether the materials seized were protected speech.

### 1. Fourth Amendment

The plaintiffs allege that the defendants' search and seizure of their property was unreasonable because: (1) the defendants lacked probable cause to believe that the plaintiffs had the mens rea required for the crimes alleged, (2) the affidavit of probable cause misrepresented and omitted certain material facts, and (3) the search warrant was unconstitutionally overbroad.

### a. Probable Cause

In order to obtain a warrant properly, an officer must submit an affidavit containing sufficient facts and circumstances to enable a neutral magistrate to make an independent finding of probable cause. United States v. Ventresca, 380 U.S. 102, 107-08 (1965). Probable cause is determined by a totality-of-the-circumstances analysis. Based upon the affidavit of probable cause, the magistrate must be able to make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found

in a particular place." <u>United States v. Vosburg</u>, 602 F.3d 512, 526 (3d Cir. 2010).

A court reviewing a warrant must pay "great deference" to the magistrate's determination of probable cause. <u>Illinois v. Gates</u>, 462 U.S. 213, 236 (1983). A probable cause affidavit "must be read in its entirety and in a common sense and nontechnical manner." <u>United States v. Williams</u>, 124 F.3d 411, 420 (3d Cir. 1997). The evidentiary standard for probable cause is "significantly lower" than the standard required for conviction of a crime and merely requires a "fair probability" that a person committed the relevant crime. <u>See</u> <u>United States v. Wright</u>, 409 F.3d 595, 602 (3d Cir. 2005) (<u>quoting</u> <u>Adams v. Williams</u>, 407 U.S. 14, 149 (1972)); <u>Wilson v. Russo</u>, 212 F.3d 781, 789 (3d Cir. 2000). Probable cause, therefore, may be "inferred by considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide the property." <u>Williams</u>, 124 F.3d at 420 (quotations omitted).

In the affidavit of probable cause, the affiants, Agent Deery and Detective McDonough, state that it was their belief that (1) the plaintiffs were committing violations of § 6312(c) and (d) and § 7512 and (2) evidence of crimes relating to those statutes would be located at the plaintiffs' premises.[17] The

_____

[17]    The affidavit states that the affiants "believe that the crime of Sexual Abuse of Children, Possession/Distribution of

20

plaintiffs argue that the defendants lacked probable cause to
believe that the plaintiffs met the mens rea requirement of
§ 6312, which requires that the suspect knowingly possess,
distribute, disseminate, display or exhibit child pornography.[18]
Although the plaintiffs concede that the individual elements of a
crime, including mens rea, may be inferred based upon a totality
of the circumstances, they argue that an objective view of the
circumstances does not lead to the conclusion that the defendants
had cause to believe that the plaintiffs had the required mens
rea.  See, e.g., Pl.'s Opp'n at 25.

        The defendants argue that (1) the affidavit need not
establish probable cause that the plaintiffs had the required
mens rea, but, instead, merely needed to show probable cause that
evidence of a crime would be found on the plaintiffs' computer

_____

Child Pornography, [in violation of § 6312(c) and (d) and
§ 7512], was/is being committed by Voicenet, OTI Productions, and
Quikvue [at their premises]."  Aff. of P.C. at 1.  The affidavit
further states that it was the affiants' belief "that evidence of
the crimes relating [to] Sexual Abuse of Children,
Possession/Distribution of Child Pornography, [in violation of §
6312(c) and (d) and § 7512], was/is being committed by Voicenet,
OTI Productions, and Quikvue will be located at the premises at
17 (Voicenet) and 21 (OTI Productions) and 23 Richard Road."

        [18]    Section 6312(c)'s elements include knowingly selling
distributing, disseminating, displaying or exhibiting to others,
or possessing for the above purposes any computer depiction or
other material depicting a child engaging in sexually explicit
conduct.  Section 6312(d) contains three elements: (1) a
depiction of an actual child engaged in a prohibited sexual act
or simulation of such act, (2) the child is under 18, and (3) the
defendant must have possessed or controlled the depiction
knowingly.

servers; and (2) even if the affidavit does need to establish probable cause of mens rea, the affidavit, read in its entirety and considering the totality of the circumstances, establishes a fair probability that the plaintiffs' had the required mens rea for a violation of § 6312.

For their first argument, that mens rea did not need to be established at all, the defendants rely on the Supreme Court of the United States' statement in <u>Zurcher v. The Stanford Daily</u> that "[t]he critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." 436 U.S. 547, 558 (1978). In <u>Zurcher</u>, the Supreme Court found that a search of a university newspaper's offices for potentially incriminating photographs did not violate the Constitution, despite the fact that the officers did not have cause to believe that any person at the newspaper itself was guilty of a crime.

In this case, however, the probable cause affidavit states that the affiants believed that the plaintiffs themselves were committing violations of § 6312 and § 7512. Thus, the magistrate must have been able to conclude that under the totality of the circumstances there was a "fair probability" that the plaintiffs knowingly possessed or distributed child

pornography and intentionally, knowingly, or recklessly used a communication facility in the underlying felony. See 18 Pa. Cons. Stat. §§ 6312(c),(d); 18 Pa. Cons. Stat. § 7512. See also Comm. v. Moss, 852 A.2d 374, 381 (Pa. Super. Ct. 2004) (discussing mens rea for § 7512). To support this conclusion, probable cause does not require "the same type of specific evidence of each element of the offense as would be needed to support a conviction." Wright v. City of Phila., 409 F.3d 595, 602 (3d Cir. 2005).

The United States Court of Appeals for the Third Circuit has found such probable cause to be established in two scenarios involving computers. The Court of Appeals has found that probable cause may be established by linking the possession or distribution of child pornography to a particular Internet Protocol Address (an "IP address"). See Vosburg, 602 F.3d at 512. In Vosburg, the defendant clicked a fake Internet link to child pornography placed on a website known to traffic in child pornography by a federal agent. The agent recorded the IP address of the computer that attempted to access the link, traced the IP address to the defendant's house, and obtained a warrant to seize the defendants' computer hardware. Because IP addresses are unique and because the attempts to access the link were traced to the defendant's IP address, the Court of Appeals found that it was fairly probable that "instrumentalities or evidence"

of the crime of attempted possession of child pornography, such as computers and computer equipment, would be found in Vosburgh's apartment.  Id.

The Court of Appeals has also found that probable cause may also be established through online account information, such as membership in a Web-based email service or with a pornography website.  See, e.g., United States v. Shields, 458 F.3d 269, 279 (3d Cir. 2006).  This scenario is most common when investigators have discovered the membership list of a child pornography website or email group, usually by serving a subpoena upon the internet service provider that hosts the group or website. In Shields, the Court of Appeals found that probable cause was established by the defendants' membership in on-line child pornography group and the defendants' "suggestive" email address of "LittleLolitaLove@aol.com".

In both scenarios, the inference of intent could be inferred through some act performed by the criminal suspect, such as the act of attempting to download images of child pornography through a specified IP address or the act of joining a child pornography website or email group.  The question here, therefore, is whether, in the totality of the circumstances, similar intent can be inferred from the facts alleged in the affidavit of probable cause.  Although there is no evidence of an affirmative attempt to access child pornography like the one

performed in <u>Vosburgh</u> or to join an on-line group like the one in <u>Shields</u> in these circumstances, there are facts that show that it was at least reasonable for the affiants to believe that the plaintiffs were aware that contraband such as child pornography was being stored on their servers and accessed by their users.

The affidavit states that Quikvue's website emphasized its lack of censorship, filtering or monitoring, its commitment to maintaining subscriber privacy, and its promise of providing an "all-you-can-eat taste of the 'Internet gone wild.'" Furthermore, in response to user queries for pictures, the plaintiffs' website warned users that they "must decide what is appropriate and or legal to download and whether or not you wish to continue." Aff. of P.C. at 2.

A reasonable magistrate could read these statements, under the totality of the circumstances, as creating a fair probablity that the plaintiffs knew that some sort of contraband material would be accessible via Quikvue. Although none of the website's statements are necessarily suggestive of child pornography per se, they do imply that the material accessed by Quikvue users might be subject to "censorship" or "filtering" elsewhere and that interested users would receive "unmonitored" and private access to such materials through Quikvue. A reasonable magistrate, therefore, could find that those statements create a fair probability that evidence of the crime

of knowing possession or distribution of child pornography in violation of § 6312, especially when coupled with the affiants' detailed allegations that images of child pornography were traced to the plaintiffs' servers through an IP address.[19]

Finally, the plaintiffs argue that the defendants should have used the various subpoena procedures available to them in lieu of executing a search and seizure of their property. A subpoena seeking, for example, the plaintiffs' subscriber lists may have been an available option, but the question here is whether the defendants complied with the law. The Court knows of no legal requirement that the defendants issue a subpoena instead executing an otherwise valid warrant in these circumstances.

b.    <u>Assertions and Ommissions</u>

To challenge the truthfulness of factual statements made in support of a probable cause affidavit, a plaintiff must establish that (1) the police officer knowingly and deliberately, or with reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for the warrant,

---

[19]    The Court notes that the standard it applies is not whether such evidence would be sufficient to support conviction, but merely whether a reasonable magistrate could conclude that given the plaintiffs' statements and policies, there is a fair probability that the plaintiffs knew that their computer systems contained images of child pornography. This reasoning would likely not apply to an internet service provider that did not market itself in such a way as to suggest knowledge of illegal content on its servers.

and (2) that such statements or omissions are material, or necessary, to the finding of probable cause. Wilson, 212 F.3d at 786-87. The plaintiffs allege that the affidavit in this case contained one false assertion and several omissions.

An assertion is made with a reckless disregard for the truth when, "viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." Id. at 788. The plaintiffs argue that the affidavit's assertion that the plaintiffs had violated § 6312 (c) and (d) was false because Agent Deery's later testimony establishes that she had no reason to believe that the plaintiffs knew that their computer servers contained child pornography.

In view of all of the evidence, however, there is no reason to conclude that Agent Deery entertained serious doubts as to the truth of her statement that she had probable cause to believe that the plaintiffs violated § 6312 (c) and (d). The plaintiffs point solely to Agent Deery's deposition testimony that she did not know whether any individual at either Voicenet or OCI knew that child pornography was contained on the Qukivue servers. Deery Dep. at 111-12. Such testimony, however, does not lead to the conclusion that Agent Deery knew that no individual at Voicenet or OCI was aware that their servers contained child pornography or even that she entertained serious

doubts as to whether an individual at Voicenet or OCI had such
knowledge.

In fact, Agent Deery also testified that the statements
on Quikvue's website touting the fact that Quikvue delivered
uncensored material and promise not to monitor a user's access
were "red flags" that led her to believe that the plaintiffs
"were clearly aware that if you're using Usenet, you're going to
get a whole lot of everything, including child pornography."  Id.
at 72:1-4.  According to her testimony, such a statement "almost
tells me [the plaintiffs] knew" that child pornography was on
their servers.  Id. at 72:4-5.

The plaintiffs also argue that the affidavit contained
the following material omissions:  (1) that Quikvue contained
constitutionally protected images and articles; (2) that Quikvue
provided web access to the Usenet, not a separate newsreader; (3)
that the Usenet was an unmonitored network, and the plaintiffs
had no control over its content; and (4) that the images at issue
were not created or posted to the Usenet by the plaintiffs.[20]

The standard for deciding whether an omission is made
with a reckless disregard for the truth is determined by asking
whether the officer knew a fact and nevertheless withheld it from
the affidavit, even though "[a]ny reasonable person would have

_____

    [20]    The plaintiffs also allege that the affidavit omits the
fact that Agent Deery and Detective McDonough had no reason to
believe that the plaintiffs had knowledge of the images at issue.
The Court has already addressed this argument.

known that this was the kind of thing the judge would wish to know." Wilson, 212 F.3d at 788. In order to determine the materiality of any omissions, the Court must reconstruct the relevant portions of the affidavit with the omissions included to determine if probable cause still exists. Sherwood v. Mulvihill, 113 F.3d 396, 400 (3d Cir. 1997).

The plaintiffs argue that Agent Deery omitted from the affidavit the fact that many images found in her searches were legal, constitutionally-protected images. This information, however, was not omitted from the affidavit. A reasonable reading of the statements in the affidavit implies that only some of the images contained on the plaintiffs' servers were child pornography. The affidavit states that, after a search of the term "underage," "a significant number of the images located" were child pornography. In describing Agent Deery's search of the term "firsthair," the affidavit again states that a "significant amount" of the images returned were child pornography. The phrases "a significant number" and "a significant amount" necessarily imply that some of the images were not child pornography.

Nor were the facts that Usenet was an unmonitored network and that the plaintiffs had no control over its content omitted from the affidavit. The affidavit quoted Quikvue's disclaimer that specifically stated the nature of Usenet and that

the plaintiffs did not control the content posted on Usenet. Furthermore, a more detailed description of Usenet and its relation to Quikvue would not be material.  Even if such information had been included in greater detail in the affidavit, probable cause that child pornography would be found on the Quikvue servers would still exist.

A statement that the plaintiffs did not create or post the images at issue is also immaterial.  Neither § 6312 (c) nor (d) requires that the criminal suspect create the images or place them on the Internet.

c.  Overbreath

The particularity requirement of the Fourth Amendment requires that every warrant "particularly describ[e]" two things: "the place to be searched" and "the persons or things to be seized."  U.S. Const. Amend. IV; see United States v. Grubbs, 547 U.S. 90, 97 (2006).  Where the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with "scrupulous exactitude." Zurcher, 436 U.S. at 564.  In such circumstances, "the warrant requirement should be administered to leave as little as possible to the discretion or whim of the officer in the field." Id.  This does not mean, however, that additional elements are added to the normal warrant requirements when First Amendment interests may be

implicated by a search warrant.  The properly administered

preconditions for a warrant, "probable cause, specificity with

respect to the place to be searched and the things to be seized,

and overall reasonableness," are sufficient to protect a party's

First Amendment rights.  Id. at 565.

          The plaintiffs argue that the warrant issued in this

case was overbroad because it authorized the seizure of a large

number of constitutionally protected materials in addition to

child pornography.  They rely upon the Court of Appeals'

nonprecedential decision in Lesoine v. County of Lackawanna, 77

F. App'x 74 (3d Cir. 2003), in support of their argument.  In

that case, authorities had been alerted that the suspect, a

photographer, allegedly possessed child pornography in the form

of photographs taken of teenagers while they used an outdoor

shower at her summer home.  The warrant that placed no

restrictions on the types of business or computer records that

could be seized and permitted the seizure of "business records,

pertaining to photography business.  Computers and computer

equipment an records.  Telephone logs or records."  Id. at 79.

The Court of Appeals found that the warrant was impermissibly

overbroad because it "requested the seizure of lawfully possessed

material of no evidentiary value," including photographs of

adults, business records and the plaintiff's computer equipment.

Id. at 79.

In this case, however, the affidavit of probable cause specifically establishes, in detail, how the plaintiffs' computer system would be of evidentiary value in the search for evidence of child pornography.  The affidavit, which was incorporated into the warrant, states sufficient facts to establish probable cause to believe that contraband would be found in the Quikvue computer system.  It limits the scope of the search to Quikvue's business records, subscriber information, any records pertaining to the distribution or possession of child pornography, and any and all visual depictions of minors engaged in sexually explicit conduct. It also provides that, based upon their training and experience, the affiants knew that computers are utilized by individuals who exploit children, including those who collect and distribute child pornography.  The warrant in this case, therefore, was specific as to the place to be searched and the items to be seized, left nothing to the "discretion" or "whim" of the officers conducting the search and complied with the normal preconditions for a warrant.

The plaintiffs also argue that the warrant was overbroad because it allowed the defendants to seize and keep their equipment off-site.  They argue that, instead, the defendants should have seized only the contraband itself, by segregating the contraband material on the plaintiff's premises. Because of the difficulties inherent in finding, segregating and

preserving evidence of contraband on computer systems, however, courts routinely allow the seizure of computer hardware to conduct an off-site search.  See, e.g., United States v. Hay, 231 F.3d 630,  634 (9th Cir. 2000); United States v. Upham, 168 F.3d 532, 535 (1st Cir. 1999); Guest v. Leis, 255 F.3d 325 (6th Cir. 2001).[21]  Although the United States Court of Appeals for the Third Circuit has not directly addressed this issue, it has permitted the seizure of computer hardware upon a showing of probable cause that the hardware is the instrumentality or evidence of a crime, such as the possession of child pornography. See, e.g., Vosburg, 602 F.3d at 527 (allowing the seizure of a destroyed computer hard drive, key drive and external hard drive).

In this case, the affidavit throughly explains the necessity of seizing the plaintiffs' entire computer system to accurately retrieve and preserve any evidence contained on that system.  It states that evidence may be accessible only when the particular system is intact or that the evidence may be affected or altered if copied onto a different system.  It also explains that evidence may be destroyed, deleted or hidden, and that the process of finding such evidence is time-consuming and may require a laboratory environment to be done effectively.  Nor is

---

[21]    Some courts have found that a computer containing child pornography is generally considered to be contraband, because it is the repository of data that is contraband.  See Hay, 231 F.3d at 637 (9th Cir. 2000).

there evidence that the officers went beyond the scope of the
warrant in executing the search.  In fact, the officers seized
only five pieces of Quikvue equipment, out of approximately 150
to 200 pieces of equipment located in the plaintiffs' facility.


2.   First Amendment

Throughout this litigation, the Court has been mindful
of the First Amendment issues raised by the defendants' possession
of the plaintiffs' equipment.  At a very early stage, the Court
worked with the parties to return the plaintiffs' equipment and
allow them to resume their Quikvue service.  While the parties
litigated the instant motions, the Court again worked with the
parties to have the last remaining pieces of plaintiffs'
equipment, the RAID arrays, returned.

Now that the equipment has been returned, the
plaintiffs' only remaining claim under the First Amendment is
that the defendants violated their First Amendment rights by
failing to hold a prior adversary hearing to determine whether
the materials seized were constitutionally-protected speech.  In
support of this argument, the plaintiffs cite a line of Supreme
Court precedent that requires a magistrate to hold a hearing to
determine whether magazines, books or films are obscene and
should be removed from circulation before the magistrate issues a

warrant allowing for the seizure of such materials.[22]  The
plaintiffs argue that such a hearing was required before the
magistrate issued the warrant in this case.

The defendants, however, point to another line of
precedent, beginning with <u>Heller v. New York</u>, 413 U.S. 483
(1973), to support the proposition that the seizure of obscene
material for evidentiary purposes only requires a valid search
warrant, issued by a neutral magistrate after a finding of
probable cause.  <u>Heller</u> involved the question of whether a
judicial officer could issue a valid warrant authorizing the
seizure of an obscene film as evidence in a prosecution against
the exhibitor without first conducting an adversary hearing on
the issue of obscenity.  After viewing the allegedly obscene film
in the theater, the judge had signed several warrants, including
a search warrant for the seizure of the film.  No one at the
theater was notified or consulted prior to the issuance of the
warrants.

Distinguishing the case from the line of cases cited by
the plaintiffs, the Supreme Court stated in <u>Heller</u> that it "has
never held, or even implied, that there is an absolute First or
Fourteenth Amendment right to a prior adversary hearing
applicable to all cases where allegedly obscene material is

---

[22]     <u>See, e.g.</u>, <u>Fort Wayne Books, Inc. v. Indiana</u>, 489 U.S.
46 (1989); <u>A Quantity of Copies of Books v. Kansas</u>, 378 U.S. 205
(1965); <u>Bantam Books, Inc. v. Sullivan</u>, 372 U.S. 58 (1963);
<u>Marcus v. Search Warrants of Property</u>, 367 U.S. 717 (1961).

seized." <u>Heller</u>, 413 U.S. at 488. The Supreme Court further distinguished <u>Heller</u> by explaining that the cases requiring a hearing all involved the seizure of large quantities of materials, such as books, for the sole purpose of their destruction or the absolute suppression of the materials themselves. In <u>Heller</u>, only a single copy of the film was seized for the purpose of preserving it as evidence in a criminal proceeding. The Supreme Court held that "[i]f such a seizure is pursuant to a warrant, issued after a determination of probable cause by a neutral magistrate, and, following the seizure, a prompt judicial determination of the obscenity issue in an adversary proceeding is available at the request of any interested party, the seizure is constitutionally permissible." <u>Id.</u> at 492.

The standard articulated by the Supreme Court in <u>Heller</u> applies to the defendants' actions in this case. The purpose of the seizure was not the destruction or suppression of the Quikvue materials themselves. Instead, the materials were seized for the purpose of preserving evidence of child pornography for a possible criminal proceeding.

The plaintiffs argue, however, that <u>Heller</u> is distinguishable from this case because, in <u>Heller</u>, the magistrate had viewed the film itself prior to issuing the warrant and therefore had personally determined the obscenity of thing to be

seized.  They argue that such a "procedural safeguard" was also necessary here.

This argument is unconvincing.  The purpose of a prior judicial determination of obscenity is to prevent the suppression of materials in cases where the issue of obscenity is in question.  The obscenity of the materials seized in this case, however, was never in question.

The affidavit of probable cause provided detailed descriptions of the child pornography found under Agent Deery's searches.  The plaintiffs do not contest that such images of child pornography are not constitutionally protected material or that the probable cause affidavit established a fair probability that such images could be found on their servers.  Nor do the defendants dispute that constitutionally protected materials also existed on the plaintiffs' servers at the time of the seizure. No further determination by the magistrate was necessary in this case, and the plaintiffs have been unable to articulate what further purpose would have been served by any such determination.[23]

---

[23]    The plaintiffs argue that an opinion from a District Court the Eastern District of Pennsylvania urges a different result.  See Ctr. for Democracy & Technology v. Pappert, 337 F. Supp. 2d 606 (E.D. Pa. 2004) ("CDT").  CDT, however, dealt with a Pennsylvania statute that required Internet Service Providers to block access to images of child pornography.  It did not address the issue of a search and seizure of evidence of child pornography and is inapplicable here.

The seizure in this case was constitutionally permissible under the _Heller_ standard.  As already established, the warrant was issued after a determination of probable cause by a neutral magistrate.  No further determination or procedure was required.

      B.   <u>Monell and the Commerce Clause</u>

The plaintiffs bring claims against Attorneys General Corbett, Green and Gibbons and Detective Thiel and McDonough in their official capacity.  A claim against a municipal officer in his official capacity is considered a claim against the entity. <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985); <u>Monell v. Dep't of Soc. Servs. of N.Y.</u>, 436 U.S. 658, 690 n.55 (1978). Municipalities and other local government units are included among those "persons" to whom § 1983 applies.  <u>See</u> <u>Monell</u>, 436 U.S. at 690.  To hold a municipality liable under § 1983, however, a plaintiff must establish that a policy or custom of the municipality caused the constitutional violation.  <u>Id.</u> at 694.

The plaintiffs' policy or custom claims arise out of the failure to hold a prior adversary hearing to determine whether some of the items to be seized were constitutionally protected.[24]  Because the Court has already determined that the

---

[24]   <u>See, e.g.</u>, Pl. Opp'n at 21-22; Plaintiffs' Opposition to Defendant G. Michael Greene's Motion for Summary Judgment at 8

failure to hold a hearing in these circumstances did not violate the constitution, the Court grants summary judgment for all of the defendants named in their official capacity.

The plaintiffs also allege a dormant commerce clause violation arising out of the seizure of their computer equipment. They argue that the raid created an excessive burden on interstate commerce because the raid harmed their customers' access to Quikvue.  At oral argument on the parties' motions, however, counsel for the plaintiffs conceded that the alleged commerce clause violation depends upon the defendants having also violated the Fourth Amendment.  Transcript of July 9, 2009, Hearing at 88:12-18.  Because the Court has found that the defendants have not violated the Fourth Amendment, the Court also finds no corresponding violation of the commerce clause.

n.3.

C.   CDA

     The plaintiffs request injunctive and declaratory
relief under the immunity provisions of the CDA.[25]   They seek a
declaration that (1) they fulfill the requirements for CDA
immunity and therefore cannot be subject to criminal prosecution
under § 6312 and (2) that the search and seizure violated their
constitutional rights because they satisfy the requirements for
CDA immunity.   They also seek injunctive relief enjoining the
defendants from prosecuting the plaintiffs.[26]

     Addressing the plaintiffs' injunctive claims first, it
is well-established that a court may not enjoin the enforcement
of a criminal statute, regardless of whether the statute is
constitutional.  Wooley v. Maynard, 430 U.S. 605, 711-12 (1977);
Stolt-Nielsen, S.A. v. United States, 442 F.3d 177, 183 (3d Cir.
2006).   There is a limited exception to this general rule,
however, where the threat of prosecution has a chilling effect on
constitutional rights.  Dombrowski v. Pfister, 380 U.S. 479,
486-87 (1965).  The plaintiffs argue that they have suffered such

_____

     [25]   The CDA provides, in relevant part:  "No provider or
user of an interactive computer service shall be treated as the
publisher or speaker of any information provided by another
information content provider."  47 U.S.C. § 230(c)(1).  The CDA
further provides: "No cause of action may be brought and no
liability may be imposed under any State or local law that is
inconsistent with this section."  47 U.S.C. § 230(e)(3).

     [26]   The plaintiff's request for the immediate return of the
seized items is now moot.  All of the materials have been
returned.

a chill on their First Amendment rights based upon the search and seizure conducted in 2004.

The facts of this case do not fall within the limited exception provided in <u>Dombrowski</u>. The chill in <u>Dombrowski</u> was caused by several incidents, including arrest, search and seizure, continued threats of prosecution, and repeated pronouncements that the organization in question was subversive and Communist. 380 U.S. at 487-88. As the Court previously recognized when it denied the plaintiffs' motion for a preliminary injunction in this case, there has been no definite or continued threat of either prosecution or future seizures of equipment. <u>Voicenet Communications, Inc. v. Pappert</u>, 2004 WL 1732187 at *4 (E.D. Pa. July 15, 2004). The plaintiffs' equipment has been seized only once. All of the plaintiffs' equipment has been returned. No further seizures have occurred in the six years after the initial seizure. Nor has there been a continued threat of prosecution. In fact, the defendants have affirmatively represented that no future prosecution is planned.

The Court also grants summary judgment for the defendants on the plaintiffs' requests for declaratory relief. A court may decide an issue only if it presents a live case or controversy. U.S. Const. art. III § 2; <u>Armstrong World Indus. v. Adams</u>, 961 F.2d 405, 410 (3d Cir. 1992). This constitutional provision stands as a direct prohibition on the issuance of

advisory opinions.  The Declaratory Judgment Act does not relax the "case and controversy" requirement.  <u>Travelers Ins. Co. v. Obusek</u>, 72 F.3d 1148, 1153 (3d Cir. 1995).

The plaintiffs present no current case or controversy for the Court to address.  The plaintiffs have been unable to articulate any justification for declaratory relief beyond the same constitutional chilling argument used in their request for an injunction.  A declaration from the Court would be useful to the plaintiffs only in the event of a future criminal prosecution and would do nothing more than enjoin such a hypothetical future criminal prosecution.  Any ruling from this Court, therefore, would be an impermissible advisory opinion.

An appropriate order follows separately.